## IN THE COURT OF APPEALS OF IOWA

No. 18-1711
Filed August 7, 2019

**RAYMOND BLASCO,**
        Petitioner-Appellee,

**vs.**

**NICHOLE MARIE WEBB,**
        Respondent-Appellant.
_____

Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.

A mother appeals from a decree of paternity, custody, visitation, and support. **AFFIRMED.**

Robert J. Murphy, Dubuque, for appellant.

Jessica L. McNamara of Fuerste, Carew, Juergens & Sudmeier, P.C., Dubuque, for appellee.

Considered by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**BOWER, Judge.**

A mother appeals from the district court's decree of paternity, custody, visitation, and support. She asserts she should have been granted physical care of the parties' child. We affirm.

Raymond Blasco and Nichole Webb are the parents of A.J.B., born in 2012. The parents never married but lived together for about a year. While they were together, Raymond's work schedule consisted of one week off for every two weeks of work. Nichole did not work and Raymond financially supported the family. Raymond continued to support Nichole and A.J.B. after the parties separated: Nichole used his vehicle and Raymond paid her rent and A.J.B.'s expenses. Nichole also had access to Raymond's checkbook. Raymond saw A.J.B. when he was not working.

Raymond suffered heart failure in 2014 and was on disability from 2014 to 2017. In 2014 and 2015, Raymond compiled a number of alcohol-related offenses and was jailed for about ten months, completing his sentence in August 2016.[1] He asserts he no longer drinks alcohol and has not since 2015.

In 2016, Nichole had a child with Sean Oliver.[2] In November 2016, Oliver threatened to kill Nichole while chasing her with knives; Oliver's child and A.J.B. were present at the time. She obtained a protective order against Oliver but asked that it be dropped two weeks later. She later sought a second protective order against Oliver. Nichole did not inform Raymond of the domestic violence or the

---

[1] Raymond has four convictions for operating while intoxicated (2009, 2010, 2014, 2015).
[2] The record spells his first name variously as Sean and Shawn. We will refer to him by his last name here.

protective orders—he learned of the incident when the department of human services contacted him.

On January 11, 2017, Raymond filed a petition seeking physical care of A.J.B. On April 11, the court entered a temporary custody order granting the parties joint physical care. The court ordered A.J.B. was not to be in Oliver's presence unsupervised. Trial was scheduled for December 20, 2017. However, Nichole's attorney was allowed to withdraw on October 13. New counsel filed an appearance on October 25, 2017. At Nichole's request, trial was reset for August 28, 2018. Nichole again sought to continue trial on August 23, 2018. Raymond resisted and the court denied the motion.

Trial was held on August 28, 2018. At the time of trial, Raymond was thirty-one years old. Raymond married Angela on March 29, 2017. They reside with their eleven-month-old son in Kieler, Wisconsin. Raymond works full-time at Newt Marine in Dubuque, Iowa, as a deck hand and makes $57,000 a year. For five to six months each year, his work schedule is seven days on and seven days off and while working he resides in a camper about four hours away from home. The other six months of the year, he resides full time in Kieler and works in Dubuque with a 7:30 a.m. to 3:30 p.m. schedule.

Nichole lives with two of her four children[3] and her sister, who moved into the home Nichole rents in Holy Cross, Iowa. Nichole is not in school and does not have a job. She has a certified nursing assistant certification. The last job Nichole

---

[3] Nichole gave up her oldest child up for adoption. After the incident with Oliver, Nichole voluntarily granted sole custody of second-oldest child to the child's father, and Nichole has not seen that child for two years. She lives with A.J.B., who is her third child, and Oliver's child.

held was at ABC Learning, where she worked for eight months before she quit in March 2017. Before that, Nichole worked at a Dubuque hotel for three months and W.S. Live for a "little over two months." At the time of trial, Nichole was engaged to Martin Jaeger, whom she has been dating since June 2017. Martin lives in Dubuque with his mother, where he has lived off and on for ten years, and has worked at Dubuque Stamp for three months. Nichole testified she expected Martin to move in with her and the children at some point in the future.

A.J.B. is very active and, perhaps, hyperactive. He exhibits behavioral control problems, has an individual education plan at school, has been seeing a counselor for about two years, and receives behavior health intervention services in the parents' homes. Changes in routine and schedule can be stressful to him. A.J.B. has siblings in each parent's home.

On September 7, 2018, the district court entered a decree of paternity, custody, visitation, and child support granting the parents joint legal custody. The parenting schedule entered by the trial court provides for physical care with the father and every other weekend from Friday at 6:00 p.m. until Sunday at 6:00 p.m. with the mother. "During the child's summer break from school, the parties will alternate the care of the child on a week-on, week-off basis. [Raymond's] weeks shall coincide with the weeks he is not working."

Nichole appeals, claiming that as the child's historic primary care giver she should have been granted physical care.

We review proceedings tried in equity de novo. *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). We may review the entire record and adjudicate the issues properly presented anew. *In re Marriage of McDermott*, 827 N.W.2d 671,

676 (Iowa 2013). However, because the district court had the opportunity to hear the evidence and view the witnesses firsthand, we give weight to the district court's findings even though they are not binding. Iowa R. App. P. 6.904(3)(g); *see In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009)..

Our primary concern in determining child-custody arrangements is the best interests of the child. Iowa R. App. P. 6.904(3)(o); *see also Lambert*, 418 N.W.2d at 42. Our goal is "to place the child in the environment most likely to bring that child to healthy physical, mental and social maturity." *Lambert*, 418 N.W.2d at 42 (citation omitted). We use the same legal analysis employed in resolving custody of children in a paternity action as used in dissolution cases. Iowa Code § 600B.40(2) (2018) (directing the court to apply the provisions of section 598.41 in determining custody and visitation in paternity actions). The legislature directs us to determine the custody arrangement that "will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents . . . , and which will encourage parents to share the rights and responsibilities of raising the child unless direct physical harm or significant emotional harm to the child . . . is likely to result." *Id.* § 598.41(1)(a).

Here, the trial court considered the appropriate statutory factors concerning custody and physical care. The court expressed concerns about both parents—

> Of some concern is Raymond's history of drinking. However, the court found him to be credible when he discussed his sobriety. Further, Nichole apparently isn't too concerned with the issue because she stipulated to shared care on a temporary basis. The primary concern with Raymond is his work schedule. During the warmer half of the year (spring until fall), Raymond works one week continuously on the river, followed by one week off. If he had the physical care of the child, his wife would be providing the care for the child when Raymond was working on the river. Raymond's wife

didn't testify, and the court can only assume that she is ready, willing and able to provide for the child for an entire week when Raymond is working.

Nichole has done very little to demonstrate any stability or good parenting. She has four children with four different men, only one of whom she was married to. She gave her oldest child up for adoption. For her second-oldest child, she voluntarily gave sole custody to the child's father, and Nichole hasn't seen that child for two years. (Nichole says she was guilted into signing that child away because she was trying to protect [Oliver's] younger brother from allegations that he had been somehow involved in child molestation.) Her third child is AJB. Her fourth child was fathered by Shawn Oliver who, in November 2016, chased Nichole around with knives threatening to kill her—with AJB and the youngest child both present. Nichole is now engaged to Martin Jaeger, a [man] who works third shift at a machining company and lives with his mother in her home.

Nichole has her [certified nursing assistant] certification, but she didn't mention ever working in that capacity. Her most recent job was with ABC Learning, where she worked for eight months at $8.75 or $9.00 per hour. Prior to that, she worked for WS Live in Dubuque for two months at $11.00 per hour. Currently, she is not employed and not in school.

Nichole testified she did not work because she was "dedicated to [her] son and his appointments, therapy and everything else that's going on in his life." We note the child is in school and the record does not indicate needed appointments other than with his therapist, which were weekly.[4] At the same time, the child had numerous absences from school about which the principal expressed concern.

On our de novo review, we find no reason to diverge from the trial court's findings and decree. While we recognize Nichole was the primary care giver prior to the temporary custody order, that status is not the only consideration.[5]

---

[4] Nichole testified,

Up until June, we stopped this summer seeing—to see how his behavior would be. His last official appointment was with his dad, which was June 19, [2018,] and Ray just started that back up this August 23rd. But prior to us stopping, he was going pretty consistently every week.

[5] The court considers a number of factors in determining which parent should have physical care. *See* Iowa Code § 598.41(3); *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974). The fundamental goal in determining physical care is to place the

The child has two caring parents. Nichole herself acknowledged Raymond has turned his life around and that she is "proud of what he has done with his life." She stated he "stepped up as a father" and has been involved in A.J.B.'s life since Raymond got out of jail. Nichole herself testified he is a "hardworking man" with whom the child loves spending time. Giving due consideration to the trial court's credibility finding, we agree with the trial court's finding that "Raymond is the more stable party and the party better suited to provide for the child's physical and emotional needs."

Nichole expresses concern about Raymond's work schedule and his absence from the home. This is the same work schedule Raymond has had since 2016. We observe that at no time from the entry of the temporary shared care arrangement in 2016 to the time of trial in September 2018 did Nichole raise concerns about Raymond's schedule or Angela's care of A.J.B. Moreover, the parenting schedule ordered by the trial court provides for alternating weeks during the summer months, which are to coincide with the father's work schedule. We affirm.

Raymond asks that we award appellate attorney fees. We may award the prevailing party reasonable attorney fees. *See* Iowa Code § 600B.26. Whether to award attorney fees is a matter of discretion with our court. *See Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). In determining whether to award attorney fees,

---

child in the care of the parent who will likely accommodate the long-range best interests of the child. *Winter*, 223 N.W.2d at 167. While stability and continuity of caregiving are important considerations, there are other factors. *In re Marriage of Hansen*, 733 N.W.2d 683, 696–97 (Iowa 2007). "The objective of a physical care determination is to place the child[ ] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Id.* at 695.

we consider "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* (citation omitted). Inasmuch as Nichole has no employment, we decline to award attorney fees.

**AFFIRMED.**